## IN THE OREGON TAX COURT

Don and Kathryn SIMMS
*v.*
## DEPARTMENT OF REVENUE
(TC 2582)

D. Dale Mammon, Attorney at Law, LaGrande, represented plaintiffs.

Ted E. Barbera, Senior Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered April 27, 1988.

**CARL N. BYERS, Judge.**

This case concerns the value of plaintiffs' roller skating rink as of January 1, 1985. Plaintiffs appeal from a value of $305,690 established by defendant and contend that the true cash value as of the assessment date did not exceed $152,000.

The subject property is located in the City of LaGrande. Constructed in 1981, the 12,000 square foot building, a type commonly known as a Butler building, has a steel frame and metal siding with some stone facing. Approximately 9,000 square feet is used for the roller skating area, with the rest of the building devoted to the check area, the office, snack bar, rest rooms and miscellaneous storage. In addition, there is an asphalt parking area of approximately

15,240 square feet. Although the property appears to be located off the main street, with somewhat limited access, there is no indication that this hinders the business.

There is some evidence to indicate that the subject property's cost new was close to $500,000, although it is not clear how much of this would have been for personal property such as snack bar equipment, sound equipment, roller skates, and maintenance equipment. It is clear that the roller rink business was not as lucrative as the original owners anticipated. By 1984, the original parties were in default on their bank loan. It was at this point that plaintiffs entered the picture.

Mr. Simms, after graduating from college, was employed by the Boy Scouts of America for 15 years, working primarily with inner-city minority youth. He was transferred to LaGrande in 1981, which provided an entirely different atmosphere for him and his family. Rather than leave LaGrande when another transfer became eminent, he decided to leave the Boy Scouts organization and find other employment. While in the process of seeking other employment or business opportunities, he heard that the roller rink was in trouble and might close. After talking with the bank and negotiating with the original owners, plaintiffs agreed to purchase the property on August 1, 1984.

Mr. Simms' perception of the transaction was essentially that the bank said, "Here are the keys, see if you can make a go of it." The purchase price for the property, including all of the related personal property, consisted of assuming the bank debt of $342,809.43, plus payment of certain outstanding bills of $23,013.03.

However, plaintiffs also were unable to attract sufficient business and by February 1985 were unable to make the monthly payments on the bank loan. This precipitated new negotiations with the bank. Initially, the bank agreed to reduce only the interest rate. However, when this proved insufficient, in October 1986 the bank agreed to reduce the principal amount of the loan to $200,000.

Another relevant occurrence took place in the fall of 1984. Just a few months after plaintiffs purchased the property, they were notified by their insurance company that it

was canceling their liability insurance. Mr. Simms testified that the whole roller skating industry was deprived of liability insurance coverage within a matter of days. Undoubtedly such an event would adversely impact the value of roller skating rink property. He also testified that the number of operating roller rinks has diminished by approximately 90 percent since 1984. Apparently, few owners are willing to do as plaintiffs do, which is operate without liability insurance.

Although the dispute in this case pertains to both land and building, the kernel is the building itself. As a special use building, it is not readily adaptable to other uses. Plaintiffs' appraiser was of the opinion that highest and best use of the building was other than as a roller skating rink. The court is persuaded that such use is its highest and best use. Defendant's view that the highest and best use of the building is as a roller skating rink follows from defendant's conclusion that plaintiffs' purchase of the property is a market sale and therefore a valid indication of its value. Defendant's appraiser also utilized the cost approach with depreciation for economic obsolescence based upon the sale.

The threshold question in this case is whether plaintiffs' purchase of the property was a market sale that can be looked to as a persuasive evidence of value. The court does not believe that it qualifies as such. To qualify, a sale must be recent, voluntary, arm's-length, between knowledgeable parties willing but not compelled to deal. A sale meeting these conditions, while not conclusive, may be very "persuasive" of value. *Kem v. Dept. of Rev.*, 267 Or 111, 514 P2d 1335 (1973). In this instance, plaintiffs had no prior business experience, had never been involved in purchasing property for investment or business, and had no prior experience in operating a roller rink business. Plaintiffs could not be said to be knowledgeable buyers. Mr. Simms asked a CPA who was familiar with the subject property's operations with regard to its purchase and was advised not to buy it. Likewise, he asked two friends, one a local businessman and the other a local attorney, as to the wisdom of purchasing the property and both advised him not to buy. This would tend to indicate that plaintiffs, in their inexperience and needful circumstances were acting contrary to what the normal market would do. Likewise, the financial records furnished to plaintiffs were incomplete and inadequate for a reasonable and informed

evaluation of the business prospects. Yet despite this, plaintiffs proceeded to purchase the property. Under these circumstances, even defendant's appraiser conceded that plaintiffs were "possibly not informed" buyers.

Two other conditions suggest that this transaction was atypical of the market. First, the bank which held the mortgage approved plaintiffs as purchasers and allowed them to assume the loan with no down payment. In addition, the bank loaned plaintiffs an additional $23,000 to pay outstanding bills. Moreover, plaintiffs, with no prior business experience, had less than 10 percent of the purchase price available as working capital. These circumstances are not typical of the market.

Second, an implicit condition of a sale at market value is that the property be exposed for a reasonable time on the open market. Such was not the case here. As a result, plaintiffs were without the benefit that may be derived from a seller who chooses an asking price based on some rationale which will presumably attract some interest in the market place. American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 33 (9th ed. 1987). Under these circumstances, the court does not view the sale of the subject property as persuasive evidence of its true cash value.

This being the case, what is the value of the subject property? Defendant's appraisal evidence is of limited value in answering this question because of heavy reliance upon the sale. Defendant's appraiser did not perform an income approach. When questioned, he did express the view that the roller rink income was inadequate and if he used an income approach he would probably use rental income of comparable commercial property. He agreed that the reasonable rental would be in the range of 18 to 20 cents per square foot. Defendant's appraiser did base his land value on comparable sales and his conclusions in that regard seem reasonable.

Plaintiffs' appraiser was not assigned to establish an independent opinion of value but to review the assessor's appraisal. In that regard however, he testified as to an income analysis of the property. Based on the gross sales realized by the property as a roller rink, he determined that they were so low that the highest and best use of the property would not be for a roller rink. Rather, based upon comparable commercial

rentals at approximately 20 cents per square foot and using the assessor's capitalization rate of 10.5 percent, he derived an estimate or indication of value by the income approach of $152,000.

While there undoubtedly could have been more and better evidence adduced by either party, the court recognizes the limitations the parties were laboring under. Based upon the evidence presented, the court finds that the preponderance of the evidence supports the plaintiffs' position that the true cash value of the subject property as of January 1, 1985, was not more than $152,000. In the court's view, $73,250 should be assigned to the land with the balance of $78,750 assigned to the improvements. In view of the property's age and construction cost, this value reflects an enormous loss in value due to economic obsolescence. The lack of an adequate economic and population base, the loss of liability insurance coverage and the general decline in the roller skating rink industry clearly supports such a determination. Plaintiffs to recover their costs and disbursements incurred herein.