IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| WILLIAM D. CRAMER, JR.,<br>and ROBIN CRAMER, | ) | |
| | ) | |
| Plaintiffs, | ) | TC-MD 230078R |
| | ) | |
| v. | ) | |
| | ) | |
| HARNEY COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiffs' appealed Defendant's Board of Property Tax Appeals (BOPTA) Real Property Order dated March 9, 2023, for the 2022-23 tax year. A trial was held remotely via WebEx on May 17, 2023. Plaintiffs, William D. Cramer, Jr., (Cramer) and Robin Cramer, appeared on their own behalf. Cramer, Kirby Letham (Letham), Randy Fulton (Fulton), and Curt Blackburn (Blackburn) testified on behalf of Plaintiffs. Karen Zabala (Zabala) appeared and testified on behalf of Defendant. Plaintiffs' Exhibits 1 through 7 and Defendant's Exhibits A through N were admitted into evidence without objection.

I. STATEMENT OF FACTS

Plaintiffs filed their Complaint on March 18, 2023, challenging the real market value of property identified as Account 181 (subject property) for the 2022-23 tax year. (Compl at 1.) For the 2022-23 tax year, Defendant assessed the real market value of the subject property at $64,500. (Compl at 2.) Plaintiffs filed an appeal with BOPTA, which ordered the value be sustained. (*Id.*) Plaintiffs request the court lower the subject property's real market value to $39,000. (*Id.* at 1.) Defendant requests the court uphold the real market value at the same amount found by BOPTA.

///

The subject property is a 10,000-square-foot parcel consisting of two vacant lots zoned for commercial use, located in Burns, Oregon, near the city of Hines, Oregon. (*Id.* at 2; Ex 3 at 1, 2; Ex 7.) The property lacks sewer, water access, and improvements. The property is situated adjacent to and due east of the two lots upon which Plaintiffs' primary residence sits. (*See* Ex 3 at 6-7; *see also* Ex E.)

In August 2022, the Swarthout family sold the subject property to the Blackburns, who sold the property to Plaintiffs in November 2022. (*See* Exs 1, 2, 7.) The parties' dispute primarily concerns whether Plaintiffs' purchase of the subject property and the prior sale of the subject property constitute arm's-length transactions, such that they may be used as evidence of the property's real market value.[1]

Between May of 1973 and late August of 2022, the subject property transferred ownership on numerous occasions, though during that period it was always owned in various configurations by members of the Swarthout family, whether owned outright, held in trust, or held by the estate of a deceased Swarthout family member. (*See* Ex 7.) On December 18, 2015, L. Swarthout and Donna Swarthout obtained title to the subject property in equal, one-half interests from a trust. (*Id.*) Zabala, Harney County Assessor and Tax Collector, testified that, in 2018, Donna Swarthout passed away. On August 26, 2022, three equal interests in the subject property were transferred from the Estate of Donna-Chase Swarthout with L. Swarthout still owning the majority, one-half interest. (*Id.*) Immediately thereafter, a warranty deed was recorded transferring ownership of the subject property to Blackburn and his spouse. (*Id.* at 2; *see also* Ex 1.)

---

[1] It is unusual for the court to review the extended ownership and sales history of a subject property. However, in this case, the prior sales history, marketing of the property, and Plaintiffs' purchase of the property must be considered to determine whether Plaintiffs' purchase and the prior sale of the subject property constituted arm's-length transactions.

Letham, Principal Broker at Paramore Real Estate (Paramore), testified that Paramore served as the real estate broker in facilitating the Swarthouts with the sale of the subject property. In 2021, Paramore listed the property with an asking price of $50,000. Although Letham was unable to find supporting documentation, he testified he recalls Paramore was involved in efforts to sell the subject property as early as 2013.[2] Letham testified that when listing the property for sale in 2021, Paramore advertised the property on Facebook, placed an advertising sign at the site of the subject property, posted the listing in Paramore's front office window, posted the property on its own website, and used a multiple listing system, which advertised the property on Zillow and other real estate marketing websites. (*See* Ex 3 at 2.)

In December 2021, an offer was placed on the property for a purchase price of $12,000. L. Swarthout rejected the offer, which Letham described as "very low." Letham testified that, excluding the December 2021 offeror and Blackburn, no potential buyers ever called him to express an interest in the subject property, nor were any other offers ever placed on the property. Letham testified that on at least one occasion, Paramore contacted L. Swarthout to discuss lowering the price because of the lack of interest; however, he declined to do so.

Letham described the condition of the real estate market in Burns with respect to commercial properties as difficult to assess, as he has observed numerous commercial lots sit on the market for many years without attracting any interested buyers. Conversely, he has observed buyers unexpectedly appear who are committed to buying a specific piece of commercial property. Nonetheless, Letham opined market conditions were no better in January 2022—a period of time near the subject property's assessment date for the 2022-23 tax year—than when

---

[2] Letham testified that his unsuccessful efforts to locate documentation of Paramore's earlier attempts to sell the subject property may be attributable to the fact that Paramore only began using the specific multiple listing system it currently utilizes back in 2018.

the Swarthouts sold the property in August 2022. Rather, he testified market conditions were in a usual slowdown period for winter in January 2022.

Blackburn, a Burns real estate broker with over 33 years of experience, became interested in purchasing the subject property because Paramore had erected a sign on the lot advertising its business, which Blackburn wanted to replace with a sign for his own business. He testified that he did not know the primary owner of the property, L. Swarthout, personally, though he knew of him by reputation. In February 2022, Blackburn wrote a cash offer to purchase the subject property for $35,000. Blackburn testified that, based on his professional experience and knowledge of the local market, his offer was reflective of the property's real market value. Blackburn's purchase was finalized in August 2022 when probate proceedings concluded for the Estate of Donna-Chase Swarthout. (*See* Ex 1; *see also* Ex 7 at 2.) Although Letham testified there had been a change in the Swarthouts' "family dynamics," he testified that, to his knowledge, there was no indication the Swarthouts were under duress or compulsion to sell the property.

Shortly after Blackburn's purchase of the subject property, Plaintiffs became aware of the transaction and approached Blackburn about purchasing the property. Cramer testified the subject property was of unique value to him, as trucks would often park on the property and cause significant damage by crashing into the cinderblock wall dividing the subject property and his residence. Additionally, cattle trucks would often park on the subject property, emitting odors, which affected the use and enjoyment of his residence. Cramer testified he had been aware the property was listed for sale for many years, and he had been interested in purchasing it for an extended period of time. Although Blackburn had not listed the subject property for sale, he agreed to sell the property to Plaintiffs so long as they would (1) pay a price grossing him a 10 percent profit on the property and (2) grant him an easement to leave the sign advertising his

business on the property for 10 years. Both parties agreed, and on November 17, 2022, Blackburn transferred title to Plaintiffs for $39,000. (*See* Ex 2.)

Zabala, Harney County Assessor and Tax Collector, testified that neither sale of the subject property in 2022 was an arm's-length transaction and, thus, argued that neither transaction is indicative of the subject property's real market value. Relying upon the Department of Revenue's 2017 Ratio Study Procedures, which provide that "[a] conveyance by an executor or trustee under powers granted in a will may not represent fair market value[,]" Zabala asserted the Blackburns' purchase of the subject property was not an arm's-length transaction because the transaction was not initiated until after probate proceedings began for the Estate of Donna-Chase Swarthout. (Ex B at 2.) Further, Zabala argued Plaintiffs' purchase of the subject property was not an arm's-length transaction because the property was not listed for sale on the open market. Plaintiffs argue both transactions were at arm's-length because the Swarthouts were under no duress to sell the property during the first sale. For the second, Blackburn and Cramer engaged in negotiations, and although the property was not listed on the market, Cramer was aware the property had been previously listed on the market for many years.

Both parties valued the subject property relying only on the comparative sales analysis. Plaintiffs presented two comparable sales as evidence of value. Comparable 1 (Fulton property) is a 40,000-square-foot vacant, commercial property and full city block, consisting of eight lots, equipped with both sewer and water, located one block away from the subject property. (Ex 3 at 5; *see also* Ex J.) Four of the eight lots have direct highway frontage. (*See* Ex E.) Comparable 1 sold in November 2022 for $105,000. (Ex 3 at 3.) The parties agree Comparable 1 is in poor condition requiring on-site cleanup and will incur a significant cost to cure. Plaintiffs made no adjustments to Comparable 1.

///

For tax year 2022-23, Defendant assessed the real market value of the Fulton property at $141,500. (Ex J at 1.) Although Zabala estimated the cost to cure at $40,000, she maintained Defendant's $141,500 assessment is accurate.

Plaintiffs' Comparable 2 (Oltman property) is a 15,681-square-foot vacant property, consisting of two commercial lots, equipped with both sewer and water, located in nearby Hines, Oregon. (Ex 3 at 9.) Comparable 2 sold in August 2021 for $70,000. (*Id*. at 8.) Blackburn testified that Plaintiffs selected Comparable 2 to show the value of property in an area that is generally more desirable to interested commercial property buyers than the area of the subject property; the area is located where the cities of Burns and Hines intersect. Additionally, Blackburn explained that there is a considerably higher traffic count and more available parking in the area of Comparable 2. Plaintiffs made no adjustments to Comparable 2. For tax year 2021-22, Defendant assessed the real market value of the Oltman property at $36,900. (Ex M at 1-2.)

Zabala presented Harney County Assessment Reports for seven properties, some located in the area of the subject property, and some located closer to Hines, testifying that only some had recently sold, such as Accounts 180 (Comparable 1) and 219 (Comparable 2). (*See* Exs G-M.) Comparable 1 consists of two lots, is 10,000 square feet, and is located adjacent to and due south of the subject property. (Ex E; Ex G at 1.) For the 2021-22 tax year, Defendant assessed the real market value of Comparable 1 at $99,760 with $76,500 attributable to land and $23,260 attributable to improvements. (Ex G at 1.) On June 14, 2022, a statutory warranty deed transferring title to Comparable 1 was recorded for consideration of $105,000. (*Id*. at 2.) Comparable 2 consists of two lots and is located one block south of the subject property. (Ex E.) For the 2022-23 tax year, Defendant assessed the real market value of Comparable 2 at $170,490 with $66,900 attributable to land and $103,590 attributable to improvements. (Ex I at 1.) On

July 12, 2022, a statutory warranty deed transferring title to Comparable 2 was recorded for consideration of $90,000. (*Id.* at 2.) Defendant made no adjustments to any of the seven properties for which it presented its assessment reports.

In addition, Defendant presented a list of all 12 vacant, commercial property sales occurring in Harney County during the 2021 and 2022 calendar years. (*See* Ex C.) Of each of the 12 sales, Zabala testified that only some are located near the subject property, having earlier noted that there are inadequate sales of commercial property in Harney County for purposes of indexing. Zabala made no adjustments to any of the 12 sales.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2022-23 tax year. As the party seeking affirmative relief, Plaintiffs bear the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427.[3] A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). Once evidence of value has been presented by both parties, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

///

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to the 2021 edition.

A.      *Real Market Value, Generally*

"Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD 020869D, 2003 WL 21263620 at \*2 (Or Tax M Div, Mar 26, 2003) (citation omitted).  "Real market value" is defined as:

> "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

ORS 308.205(1).  The assessment date for the 2022-23 tax year is January 1, 2022.  ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *[.]"  ORS 308.205(2).  "The department's rules call for an appraiser to value the property according to its 'highest and best use.'"  *Hewlett-Packard v. Benton County Assessor*, 357 Or 598, 602, 356 P3d 70 (2015).  The three approaches to value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach.  OAR 150-308-0240(2)(a).  Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.*

Here, both parties relied exclusively on the sales comparison approach, finding both the cost and income approach inapplicable in this matter.  The court agrees with the parties.  The cost approach is inapplicable because the property contains no new construction, and the income approach is inapplicable because Plaintiffs do not own the property for purposes of generating income.  The sales comparison approach, which "relies on sale prices of other properties that can serve the same highest and best use as the subject property[,]" is most relevant.  *Hewlett-Packard*, 357 Or at 603.

B.      *Subject Property's Purchase Price as Evidence of Real Market Value in the Sales Comparison Approach*

In applying the sales comparison approach, "only actual market transactions of property comparable to the subject, or adjusted to be comparable, may be used." OAR 150-308-0240(2)(c).

> "All transactions utilized in the sales comparison approach must be verified to ensure they reflect [arm's-length] market transactions. When non-typical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.), the transaction may not be used in the sales comparison approach unless market-based adjustments can be made for the non-typical market condition."

*Id.*

The parties dispute whether either sales price for the subject property from 2022 may be used as evidence of the property's real market value. Both the Supreme Court and this court previously determined that it is permissible to use a prior sales price of the subject property as evidence of market value in the sales comparison approach, so long as the sale of the subject property was (1) recent, (2) voluntary, and (3) an arm's-length transaction. *Kem v. Dept. of Rev.*, 267 Or 111, 114, 514 P2d 1335 (1973); *see also Acosta v. Multnomah County Assessor*, TC-MD 200140R, 2021 WL 4963136 at *4 (Or Tax M Div, Oct 26, 2021). If those three criteria are satisfied "between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Kem*, 267 Or at 114.

Whether a sale is sufficiently recent depends less on the length of time between the date of sale and assessment date and more on "the similarity of conditions affecting value at the time of the transaction and conditions affecting value at the time of the assessment." *Sabin v. Dept. of Rev.*, 270 Or 422, 426-27, 528 P2d 69 (1974) (holding that a sale occurring almost two years after the assessment date was persuasive of value, given no evidence of change in market

conditions). In the absence of evidence of change in conditions, a sale occurring after the assessment date is no less persuasive than it would otherwise be merely because it occurred after the assessment date. *Ernst Brothers Corp. v. Dept. of Rev.*, 320 Or 294, 305, 882 P2d 591 (1994) (citing *Sabin*, 270 Or at 427).

Here, the Blackburns purchased the subject property in August 2022—eight months after the assessment date—and Plaintiffs purchased the subject property in November 2022—11 months after the assessment date. Little evidence reflecting market conditions—or changes thereto—was presented by either party. Letham testified that the market as of January 2022 was no better than it was in August 2022. Absent evidence to the contrary, the court is persuaded that conditions affecting the value of the subject property were generally consistent in January, August, and November of 2022.

With respect to the second and third criteria, this court previously adopted the Appraisal Institute's definition of "arm's-length" as "[a] transaction between unrelated parties under no duress." *Acosta*, 2021 WL 4963136 at *4 (citation and internal quotation marks omitted). As such, analysis of the final two factors is interrelated. The "arm's-length analysis often includes an evaluation of whether the transaction was voluntary or made under duress, and whether there existed a relationship between the parties." *Id*. In *Acosta*, this court elected to "view an arm's-length sale as one that on the whole resembles a typical market transaction." *Id*. (quotation marks omitted).

Defendant argues the Blackburns' August 2022 purchase of the subject property was not an arm's-length transaction because the transaction was not initiated until after probate proceedings began for the Estate of Donna-Chase Swarthout. This court has routinely held that where the seller of a property may be compelled to sell the property at a lower value in order to settle debt or some other liability a transaction is not considered voluntary or arm's-length. *See*

*Rouda v. Clatsop County Assessor*, TC-MD 160206N, 2017 WL 1535213 at *5 (Or Tax M Div, Apr 28, 2017) ("A foreclosure sale does not represent a voluntary transaction between a buyer and a seller"); *see also Garton and Associates Realtors, LLC v. Umatilla County Assessor*, TC-MD 200077R, 2021 WL 4188110 at *3 (Or Tax M Div, Sept 15, 2021) (Where the sellers faced "legal fees in the probate estate and potential administrative or even criminal action pertaining to the property[,]" the court declined to rely on the sale as an arm's-length transaction). However, the mere fact that a piece of property was sold as part of the probate process does not by itself suffice to show duress or compulsion to sell existed; it merely casts doubt as to whether either did exist.

Here, Letham testified that, to his knowledge, the Swarthouts were under no duress to sell the property. Letham testified he recalls the Swarthouts making efforts as early as 2013 to sell the property—before Donna Swarthout's eventual passing. In 2021, Paramore listed the property on the market, advertising it online, in its office window, and with a sign at the site of the property. Letham testified that, on one occasion, L. Swarthout rejected an offer placed on the subject property, and on another, L. Swarthout declined Paramore's request to lower the price of the subject property. It does not appear that the Swarthout family were under any economic stress requiring them to sell the property. Although the property sold during probate proceedings, no evidence was presented to indicate the transaction was entered into involuntarily, under duress, or under economic distress. Here, the facts merely indicate Swarthout was an unmotivated seller, holding out for what he considered to be a reasonable offer. Letham did acknowledge a change in the Swarthouts' family dynamics, however, the court declines to make a finding of duress from that fact alone. Moreover, the parties had no preexisting relationship, as Blackburn was only interested in the property for financial gain and to eliminate a competing business's advertisement on the property.

Defendant also argues Plaintiffs' November 2022 purchase of the subject property was not an arm's-length transaction because Blackburn never listed the subject property for sale on the open market. The court considers that a negative factor in analyzing whether the sale represented an arm's length transaction. Here, Cramer, approached Blackburn, an experienced local real estate agent, and engaged in negotiations which appeared to be of a sophisticated nature. Blackburn, acting under no compulsion to sell the property, agreed to sell the property after negotiating himself a 10 percent profit along with a 10-year easement to continue advertising his business on the property. Although the November 2022 sale of the subject property is not a perfect example of an arm's-length sale, it represented persuasive evidence that it resembled a typical market transaction between a knowledgeable buyer and seller. Thus, the court considers it persuasive of the subject property's real market value.

C.      *Evaluation of the Parties' Comparable Market Sales as Evidence of Real Market Value*

Plaintiffs selected two comparable sales for its market analysis of the subject property, having made no adjustments to either. Comparable 1 is located near the subject property, though it is significantly larger and is equipped with sewer and water. Without guidance from Plaintiffs on how to calculate the appropriate adjustments for the subject property's smaller size and lack of sewer and water access, the court cannot rely on Comparable 1. *See* OAR 150-308-0240(2)(c). Comparable 2 is located in an entirely different area than the subject property—one which Plaintiffs admit is generally more desirable for commercial buyers—and is equipped with sewer and water. Like Comparable 1, the court cannot rely on Comparable 2 as Plaintiffs did not adjust for the change in location—a change which arguably renders Comparable 2 non-comparable in its entirety—nor did Plaintiffs adjust for sewer and water.

Defendant offers assessment reports as evidence, admitting that only some of the properties for which reports were provided had recently sold. As addressed earlier, "only *actual*

*market transactions* of property comparable to the subject * * * will be used[.]" OAR 150-308-0240(2)(c) (emphasis added). Without a recent sale or "market transaction," the court cannot rely on Defendant's assessment reports. Of Defendant's comparable properties that did recently sell, each of the properties possessed one or more of the following differences from the subject property: the property was (1) equipped with sewer and water, (2) had a building constructed on it, or (3) was located in a more commercially viable area than the subject property. Like Plaintiffs, Defendant made no adjustments to provide the court with guidance on how to account for the impact these differences had on value. Thus, the court is not persuaded by Defendant's comparable sales.

D.    *Real Market Value Conclusion*

The court deems Plaintiffs' November 2022 purchase of the subject property as the best evidence in determining the real market value of the subject property under the sales comparison approach. Thus, this court finds the real market value of the subject property as of the assessment date was $39,000.

E.    *Costs and Disbursements*

Plaintiffs filed a Statement for Costs and Disbursements on May 17, 2023, specifically requesting they be reimbursed for the court's filing fee, fees to copy exhibits, and fees to mail exhibits, totaling a requested sum of $98.02. Defendant did not file an objection to Plaintiffs' request.

Magistrates have discretionary authority to award a prevailing party's costs and disbursements "as in equity suits in the circuit court." ORS 305.490(3); *Wihtol v. Dept. of Rev.*, 21 OTR 260, 267-68 (2013). Tax Court Rule–Magistrate Division (TCR–MD) 16 (A) defines "[c]osts and disbursements" as:

"reasonable and necessary expenses incurred in the prosecution or defense of an

action other than for legal services, and include the filing fee; * * * the necessary expense of copying of any public record, book, or document used as evidence for trial; and any other expense specifically allowed by agreement, by these rules, by TCR 68 A(2), or by other rule or statute."

Plaintiffs are the prevailing party in this appeal, and their request consists of "reasonable and necessary expenses" incurred in the prosecution of their case. Thus, Plaintiffs' request for costs and disbursements is granted. TCR-MD 16 (A).

III.  CONCLUSION

Upon careful consideration, the court concludes Plaintiffs satisfied their burden of proof; thus, their request for a reduction in real market value is granted. Because Plaintiffs are the prevailing party, their request for costs and disbursements is also granted. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of the subject property for the 2022-23 tax year is $39,000.

IT IS FURTHER DECIDED that Plaintiffs' request for costs and disbursements in the sum of $98.02 is granted.

Dated this _____ day of November 2023.

_____
Richard Davis
Magistrate

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Richard Davis and entered on November 17, 2023.*